Exhibit B

LAW OFFICES OF MICHAEL A. KELLY
*Attorneys and Counselors at Law*

MICHAEL A. KELLY
admitted in RI and MA
Cumberland Office-Tel/Fax: 401-333-0807
mkelly@maklawfirm.com

JOHN O. MANCINI
of counsel
admitted in RI, MA, CT
Cranston Office-Tel: 401-464-8059
jmancini@maklawfirm.com

May 20, 2005

Mr. Raymond Bourque
P.O. Box 3107
South Attleboro, MA 02703

Vincent Mesolella
REI Investments
235 Promenade Street
Providence, RI 02908

Glen R. Ahlborg
O. Ahlborg & Sons Inc.
48 Molter Street
Cranston, RI 02910

***Re: Greatwoods Operating Agreement***

Dear Gentlemen:

Enclosed please find a draft of the Operating Agreement for your review and comment. If the Operating Agreement is acceptable to you, please sign the enclosed and return it to my attention.

If you have any questions, please contact me.

Very truly yours,

Michael A. Kelly

Michael A. Kelly

MAK/jal

Enclosure

# OPERATING AGREEMENT

# OF

# GREATWOODS DEVELOPMENT, LLC

a Rhode Island Limited Liability Company

# OPERATING AGREEMENT

# OF

# GREATWOODS DEVELOPMENT, LLC

**a Rhode Island limited liability company**

THIS OPERATING AGREEMENT (this "Agreement") of Greatwoods Development, LLC, a Rhode Island limited liability company (the "Company"), is made effective as of the ____ day of May, 2005, by and among the individuals listed in Schedule A hereto as amended from time to time (the "Members").

## ARTICLE I
## DEFINITIONS

Section 1.1 Certain Definitions. As used in this Agreement:

Act shall mean the Rhode Island Limited Liability Company Act, as now in effect or hereafter amended.

Affiliate shall mean any Person (other than an individual) that through one or more intermediaries controls, is controlled by or is under common control with another Person and includes the power to direct or cause the direction of the management and policies of a Person. With respect to an individual, Affiliate shall mean Members of such individual's immediate family and any trust all the beneficiaries of which are such individual and/or Members of his/her immediate family.

Articles of Organization shall mean the Articles of Organization of the Company filed with the Secretary of the State of Rhode Island on [-----].

Capital Account shall have the meaning ascribed to such term in Section 4.2(a) below.

Capital Contribution shall mean, with respect to any Member, the aggregate amount of money and the fair market value of any property (other than money) contributed to the Company pursuant to Section 4.1 hereof with respect to such Member's Membership Units.

Carrying Value shall mean, with respect to any asset, the asset's adjusted basis for federal income tax purposes except as follows:

(i) the initial Carrying Value of any asset contributed (or deemed contributed) by a Member to the Company shall be such asset's gross fair market value, as determined by the contributing Member and the Manager, at the time of such contribution;

(ii) the Carrying Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager, as of any Revaluation Event

(within the meaning of Section 4.2(h) hereof) in accordance with, and as permitted by, Section 1.704-1(b)(2)(iv)(f) of the Regulations;

(iii) the Carrying Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution (if such Carrying Value is not otherwise adjusted in connection with such distribution pursuant to clause (ii) above);

(iv) the Carrying Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and Section 4.2(b) hereof; provided, however, that Carrying Values shall not be adjusted pursuant to this clause (iv) to the extent the Company determines that an adjustment pursuant to clause (ii) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (iv); and

(v) if the Carrying Value of an asset has been determined pursuant to clause (i), (ii), or (iv) above, such Carrying Value shall thereafter be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes.

Change of Control shall mean, with respect to any entity, (i) a merger, consolidation or other reorganization to which such entity is a party immediately after the effect of which the holders of the equity interests of such entity own less than 50% of the voting power represented by the equity interests of the combined entity; (ii) the sale, transfer, assignment, conveyance or other disposition of all or substantially all of the business of such entity or of all or substantially all of the assets of such entity; or (iii) the reorganization, liquidation or dissolution of such entity.

Code shall mean the Internal Revenue Code of 1986, as amended.

Company Notice shall have the meaning ascribed to such term in Section 11.3(a) below.

Co-Sale Right shall have the meaning ascribed to such term in Section 11.2(a) below.

Co-Sale Units shall have the meaning ascribed to such term in Section 11.2(c) below.

Co-Selling Member shall have the meaning ascribed to such term in Section 11.2(c) below.

Dissolution Event shall have the meaning ascribed to such term in Section 13.1 below.

Distributable Cash Flow shall have the meaning ascribed to such term in Section 5.4 below.

Event of Forfeiture shall mean that the Member ceases to be employed by or otherwise rendered substantial services to the Company or its Affiliates for any reason other than the reasons described in clauses (i) or (ii) below.

(i) the Member, upon reaching the age of 65 or older, ceases to render services to the Company and provides to the Company not less than six months' prior written notice of such cessation; or

(ii) the Member dies or becomes mentally or physically disabled (as determined by a physician licensed in the State of Rhode Island, selected by a majority in number of the Members) or a conservator or guardian is appointed for the benefit of any Member of his property.

Excess Deficit Balance shall have the meaning ascribed to such term in Section 5.2(a) below.

Fair Market Value shall mean, as to any property, the price determined by application of the following formula: fair market value as determined by the Manager.

Interest shall mean a Member's limited liability company interest in the Company, which represents such Member's share of the Net Profits and Net Losses of the Company and a Member's right to receive distributions of the Company's assets in accordance with the provisions of this Agreement and the Act. If there is an Event of Forfeiture with respect to a Member's Interest, such Member's Interest shall be reduced to the amount of his or her (a) Vested Interest on the date of this Agreement (as specified in Schedule A) plus (b) amount of the Increase in Vested Interest (as specified in Schedule A) for the number of whole twelve month periods that have elapsed between the date hereof and the earlier of (i) the date on which the Event of Forfeiture occurred, or (ii) the third anniversary of this Agreement.

Interested Member shall have the meaning ascribed to such term in Section 6.9 below.

Involuntary Transfer shall have the meaning ascribed to such term in Section 11.3(a) below.

Liquidating Distribution shall have the meaning ascribed to such term in Section 13.2 below.

Liquidating Event shall have the meaning ascribed to such term in Section 11.3(a) below.

Liquidating Member shall have the meaning ascribed to such term in Section 11.3(a) below.

Liquidating Notice hall have the meaning ascribed to such term in Section 11.3(a) below.

Manager shall mean that person from time to time designated as manager of the Company in the Articles of Organization, as it may be amended from time to time.

Member or Members shall mean those Persons listed on Schedule A hereto, as amended from time to time, and such other Persons as may from time to time be admitted to the Company upon such terms and conditions as are provided in this Agreement and under the Act.

Membership Unit shall mean the interest of a Member in the Company, including, without limitation, such Member's right (a) to a share of Company allocations and distributions in accordance with the terms of this Agreement, (b) unless otherwise determined by the Manager pursuant to Section 3.1 of this Agreement, to vote, consent or withhold consent with respect to any Company matters in accordance with this Agreement, and (c) to participate in the management of the business and affairs of the Company in accordance with this Agreement.

Net Profits and Net Losses mean, for each fiscal year or other period, the Company's taxable income or loss, as the case may be, for such year or period except that (i) items that are required by Section 703(a)(1) of the Code to be separately stated shall be included; (ii) items of income that are exempt from inclusion in gross income for federal income tax purposes shall be treated as income, and related deductions that are disallowed under Section 265 of the Code shall be treated as deductions; (iii) non-deductible expenditures of the Company that are described in Section 705(a)(2)(B) of the Code, and organization and syndication expenditures and disallowed losses to the extent that such expenditures or losses are treated as expenditures described in Section 705(a)(2)(B) of the Code pursuant to Regulations § 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Net Profits or Net Losses hereunder, shall be treated as deductions; (iv) in the event the Carrying Value of any Company property is adjusted pursuant to Section 4.2(h) or (i), the amount of such upward (or downward) adjustment shall be taken into account as gain (or loss) from the disposition of such property; and (v) items of gain, loss, depreciation, amortization, or depletion that would be computed for federal income tax purposes by reference to the adjusted basis of an item of Company property for federal income tax purposes shall be determined by reference to the Carrying Value of such item of property. In the event the Carrying Value of any item of Company property differs from its adjusted basis for federal income tax purposes, the amount of depreciation, depletion, or amortization for a period with respect to such property shall be computed so as to bear the same relationship to the Carrying Value of such property as the depreciation, depletion, or amortization computed for federal income tax purposes with respect to such property for such period bears to the adjusted basis of such property. If the adjusted basis of such property is zero, the depreciation, depletion, or amortization with respect to such property shall be computed by using a method consistent with the method that would be used for federal income tax purposes if the adjusted basis of such property were greater than zero.

Offer shall have the meaning ascribed to such term in Section 11.2(a) below.

Offer Notice shall have the meaning ascribed to such term in Section 11.2(a) below.

Permitted Transferee shall have the meaning ascribed to such term in Section 11.1(b) below.

Person shall mean any natural person, company, government or political subdivision, agency, or instrumentality of a government, body corporate, association, partnership, limited liability company, firm, joint venture or trust. When two or more Persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a Person for purposes of this definition.

Prime Rate shall mean that interest rate quoted from time to time by Fleet Bank, as its "prime" or "base" rate, whether or not it is the lowest rate at which Fleet then makes commercial loans, but in any event not more than the maximum rate permitted by applicable law.

Proposed Transferee shall have the meaning ascribed to such term in Section 11.2(a) below.

Reduction Items shall have the meaning ascribed to such term in Section 5.2(a) below.

Regulations shall mean the Treasury Regulations promulgated under the Code, as from time to time in effect.

Regulatory Allocations shall have the meaning ascribed to such term in Section 5.2(f) below.

Requesting Manager shall have the meaning ascribed to such term in Section 6.9 below.

Revaluation Event shall have the meaning ascribed to such term in Section 4.2(h) below.

Right of First Refusal shall have the meaning ascribed to such term in Section 11.2(a) below.

Securities Act shall have the meaning ascribed to such term in Section 3.4 below.

Selling Member shall have the meaning ascribed to such term in Section 12.2(a) below.

Tax Matters Partner shall have the meaning ascribed to such term in Section 6231(a)(7) of the Code.

Transfer shall mean (a) any sale, assignment or other transfer of securities; (b) any sale, assignment or transfer of an economic interest and/or a voting interest in an entity that, directly or indirectly, holds any securities; (c) any sale, assignment or a transfer of securities convertible into or exchangeable for or other options or rights to acquire securities; or (d) any other direct or indirect, voluntary or involuntary, sale, assignment or transfer of securities or any interest therein.

Vested Interest shall mean the portion of a Member's Class A Profits Interest that is no longer subject to forfeiture upon occurrence of an Event of Forfeiture.

ARTICLE II
NAME, OFFICE AND FORMATION OF THE COMPANY

Section 2.1 Name. The name of the Company is GREATWOODS DEVELOPMENT, LLC.

Section 2.2 Registered Office and Agent. The registered office and agent of the Company are as set forth in the Articles of Organization.

Section 2.3 Principal Place of Business. The Company's principal place of business, and the place where its books and records shall be kept, is 235 Promenade Street, Suite 140, Providence, Rhode Island 02908, or such other place as from time to time is determined by the Manager. The records will be available for inspection and copying by the Members at such office to the extent required under the Act during regular business hours.

Section 2.4 Purpose and Powers.

(a) The business, purpose and activity of the Company shall be to engage in or carry on the business of buying, selling, leasing, managing and developing real property, and any other lawful business, purpose or activity for which a limited liability company may be organized under the Act.

(b) The Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the aforesaid purposes.

Section 2.5 Term. The term of the Company shall be deemed to have commenced on the date that the Articles of Organization of the Company were filed in the office of the Secretary of State of the State of Rhode Island and shall continue until the Company is dissolved in accordance with the provisions of this Agreement.

Section 2.6 Qualification in Other Jurisdictions. The Manager may execute, deliver and file any certificate (including, without limitation, any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

ARTICLE III
MEMBERS

Section 3.1 Membership Units. Interests in the Company shall be represented by Membership Units. Membership Units may be issued from time to time by the Members in one or more classes or series. The Members shall determine the designations, relative rights, (including voting rights), preferences (if any), qualifications, limitations, restrictions, and number of Membership Units of each such class or series. Each Membership Unit (a) shall, unless otherwise determined by the Manager, entitle the Member owner thereof to one vote on all matters submitted to the vote or consent of the Members and such other management rights as specifically set forth in this Agreement, and (b) together with all other Membership Units of a Member, represent such Member's interest in the profits, losses and allocations of the Company from and after the date of the issuance of such Membership Unit, including any increase in the value in the Company's assets and business immediately before the issuance of such Membership Unit. The names and addresses of, and the respective number of Membership Units held, by each of the Members, and the respective class or series of such Membership Units, are set forth on Schedule A hereto. The Company has authorized for issuance to Members up to an aggregate of 1000 Membership Units.

Section 3.2 Additional Membership Units. The Company may issue additional Membership Units from time to time to such persons, at such times, and upon such terms as the Members may deem appropriate. After any issuance of additional Membership Units pursuant to this Section 3.2, Schedule A shall be amended to reflect such issuances.

Section 3.3 Certificates. No certificates representing the Membership Units shall be issued unless the Members so elect. If certificates are issued, then each Member shall be entitled to a certificate stating the number and the class and the designation of the series, if any, of the shares held by him, in such form, in conformity to law, the certificate and this Agreement, as shall be prescribed from time to time by the Members. Such certificate shall be signed by either (i) the Manager, or (ii) the President or a Vice President and by the Treasurer, an Assistant Treasurer, the Secretary or an Assistant Secretary of the Company. Any of or all the signatures on the certificate may be a facsimile. In the case of the alleged theft, loss, destruction or mutilation of a certificate of Membership Units, a duplicate certificate may be issued in place thereof, upon such terms, including receipt of a bond sufficient to indemnify the Company against any claim on account thereof, as the Members may prescribe.

Section 3.4 Registration. The Membership Units have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or applicable state securities laws. The securities may not be offered, sold, assigned, pledged or otherwise Transferred in the absence of an effective registration statement under the Securities Act covering such Transfer or an opinion of counsel reasonably satisfactory to the Company that registration under the Securities Act is not required. In the event that certificates for the Membership Units are issued pursuant to Section 3.3 of this Agreement, each such certificate shall bear the legend set forth below:

THE MEMBERSHIP UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS SET FORTH IN THE COMPANY'S

OPERATING AGREEMENT, AS AMENDED FROM TIME TO TIME, AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO THE OPERATING AGREEMENT. THE MEMBERSHIP UNITS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER SAID ACT COVERING THE TRANSFER OR AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT REGISTRATION UNDER SAID ACT IS NOT REQUIRED.

Section 3.5 Resignation. Any Member may resign by filing a written resignation with the Company's President or Secretary, or the Manager or the Company, at the Company's principal office; provided, however, that such Member shall honor all contractual obligations owed by such Member to the Company in accordance with their terms. Such resignation shall be effective upon filing, unless a later effective date is specified in the notice of resignation, in which event the resignation shall take effect on the date so specified. A resignation by a Member shall be a Liquidating Event as set forth in Section 12.3 below.

Section 3.6 Annual Meeting of Members. The annual meeting of the Members shall be held on December 15 in each year (or, if that be a legal holiday in the State of Rhode Island or where the meeting is to be held, on the next succeeding business day not a legal holiday) or on such other date within six (6) months after the close of the fiscal year of the Company as may be determined by the Manager. The annual meeting shall be held for such purposes as may be prescribed by law, the Articles of Organization, this Agreement or the Manager. If such annual meeting is not held on the day herein provided therefor, a special meeting may be held in lieu thereof, and business transacted or elections held at such meeting shall have the same effect as if transacted or held at the annual meeting.

Section 3.7 Meetings. Meetings of the Members may be called at any time at the request of the President or by the Manager and shall be called by the Company's Secretary or Manager of the Company upon the written request of two (2) or more Members holding an aggregate of at least twenty-five (25%) of the outstanding Membership Units with voting rights.

Section 3.8 Place of Meetings. Meetings of the Members shall be held anywhere in the United States as stated in the notice of the meeting.

Section 3.9 Notice of Meeting. Notice of each meeting of the Members, stating the day, hour and place thereof, shall be given to each Member at least seven (7) days before the meeting, by leaving written notice with each Member at such Member's record address as shown on the books of the Company from time to time, or by mailing written notice, postage prepaid, and addressed to such Member's record address. Notice need only contain a summary of the purpose of the meeting, except that the notice of any meeting at which an amendment of this Agreement or the Articles of Organization is to be considered shall state the intended purpose and effect of the proposed amendment and shall state the proposed wording of the amendment.

Section 3.10 Quorum. Except as otherwise required by this Agreement or the Act, at any meeting of the Members, a quorum for the transaction of business shall consist of the

presence in person or by proxy of the holders of the majority of the issued and outstanding Membership Units with voting rights, but a lesser number may adjourn any meeting from time to time, and the meeting may be held as adjourned without further notice. No Member shall fail to attend a meeting of the Members for purposes of defeating a quorum or avoiding corporate action.

Section 3.11 Action at a Meeting. When a quorum is present at any meeting, the holders of a majority of the issued and outstanding Membership Units with voting rights present at such meeting and entitled to vote on such matter may decide any question properly brought before such meeting, except as otherwise required by this Agreement or the Act. The Members may only act on those matters which expressly require Member approval under the Act or this Agreement.

Section 3.12 Action by Consent. Any action required or permitted to be taken at any meeting of the Members may be taken without a meeting if the holders of a majority of the total issued and outstanding Membership Units entitled to vote on such matter consent to the action in writing, and such written consents are filed with the records of the meeting of the Members. Such consent shall be treated for all purposes as a vote at a meeting. Prompt notice of the taking of action by consent by less than unanimous written consent shall be given to those Members who have not consented in writing.

Section 3.13 Waiver of Notice. Whenever any written notice is required to be given by this Agreement, a waiver of notice signed either before or after the action for which notice is required shall have the effect of written notice. Attendance by a Member at any meeting shall also constitute a waiver of notice unless an objection to the lack of notice is made by such Member at the meeting.

Section 3.14 Proxy Voting. A Member entitled to vote at a meeting or to express consent or dissent to any action in writing without a meeting may authorize another party to act for him by proxy executed in writing by him.

Section 3.15 Limited Liability of Members. Neither any Member, nor any owner, officer, director, employee or agent of any Member, shall be liable for any debts, liabilities or obligations of the Company whether arising in contract, in tort or otherwise; provided that each Member shall be responsible:

(a) for the making of any contribution to the capital of the Company required to be made by such Member pursuant to the terms of this Agreement; and

(b) for the amount of any distribution made to such Member that must be returned to the Company pursuant to the Act.

ARTICLE IV
CAPITALIZATION

Section 4.1 Capital Contributions. Each Member shall make an initial contribution to the capital of the Company in the amount and in the form as are set forth opposite the Member's name in Schedule A attached hereto.

(a) The Members thereof agree and acknowledge that Raymond Bourque, a Member hereof, has made an initial capital contribution as set forth on Schedule B attached hereto and incorporated herein for all purposes, such contribution has been in respect to deposits, legal and engineering fees associated with the project located in Cumberland and known as the Greatwoods Subdivision and has been made prior to and/or as of the date hereof. As set forth herein, such initial capital contribution shall be paid prior to any distributions to other Members.

(b) The Members hereof agree and acknowledge that Vincent Mesolella, a Member hereof, has made a capital contribution to the Company by way of and by virtue of his expertise in building construction and management, labor and operation experience as well as experience in permitting, financing and organizing multifamily and/or single family residential developments. The Members hereto agree and acknowledge that such expertise, time and knowledge is extremely valuable to the Company and is comparable to a cash infusion of capital to the Company. The Members agree and acknowledge that Vincent Mesolella shall not be required to make a cash contribution at the initiation of the Company. As set forth herein, however, cash contribution from the Members may be required for expenses incurred by the Company in pursuit of its primary goal.

(c) The Members hereof agree and acknowledge that Eric S. Ahlborg, a Member hereof, has made a capital contribution to the Company by way of and by virtue of his expertise in building construction and management, labor and operation experience as well as experience in permitting, financing and organizing multifamily and/or single family residential developments. The Members hereto agree and acknowledge that such expertise, time and knowledge is extremely valuable to the Company and is comparable to a cash infusion of capital to the Company. The Members agree and acknowledge that Eric S. Ahlborg shall not be required to make a cash contribution at the initiation of the Company. As set forth herein, however, cash contribution from the Members may be required for expenses incurred by the Company in pursuit of its primary goal.

Section 4.2 Capital Accounts.

(a) The Company shall establish and maintain a single capital account for each Member (a "Capital Account") in accordance with this Section 4.2.

(b) Each Member's Capital Account shall from time to time be increased by: (i) the amount of money contributed by such Member to the Company (including the amount of any Company liabilities that the Member assumes (within the meaning of Regulations §1.704-1(b)(2)(iv)(c)), but excluding liabilities assumed in connection with the distribution of Company property and excluding increases in such Member's share of Company liabilities

pursuant to Section 752 of the Code); (ii) the fair market value of property contributed by such Member to the Company (net of any liabilities secured by such property that the Company is considered to assume or take subject to pursuant to Section 752 of the Code); and (iii) allocations to such Member of Company income and gain (or the amount of any item or items of income or gain included therein), including, without limitation, upon the revaluation of any Company property pursuant to Section 4.2(h) or 4.2(i) hereof, the gain (if any) that would have been allocated to such Member if such Company property had been sold at its fair market value as of the date of such revaluation (or, if greater, the amount of any nonrecourse indebtedness to which such property is subject within the meaning of Code Section 7701(g)).

(c) Each Member's Capital Account shall from time to time be reduced by: (i) the amount of money distributed to such Member by the Company (including the amount of such Member's individual liabilities for which the Company becomes personally and primarily liable but excluding liabilities assumed in connection with the contribution of property to the Company and excluding decreases in such Member's share of Company liabilities pursuant to Section 752 of the Code); (ii) the Carrying Value of property distributed to such Member by the Company (net of any liabilities secured by such property that such Member is considered to assume, or take subject to, pursuant to Section 752 of the Code); and (iii) allocations to such Member of Company loss and deduction (or items thereof), including, without limitation, upon the revaluation of any Company property pursuant to Section 4.2(h) or 4.2(i), the loss (if any) that would have been allocated to such Member if such Company property had been sold at its fair market value as of the date of such revaluation (or, if greater, the amount of any nonrecourse indebtedness to which such property is subject within the meaning of Code Section 7701(g)).

(d) The Company shall make such other adjustments to the Capital Accounts of the Members as are necessary to comply with the provisions of Regulations Section 1.704-1(b)(2)(iv).

(e) No Member shall be obligated to the Company, to any other Member, or to any third party to restore or repay any deficit in its Capital Account.

(f) Upon the transfer of a Member's entire interest in the Company, the Capital Account of such Member shall carry over to the transferee. Upon the transfer of a portion of a Member's interest in the Company, the portion of such Member's Capital Account attributable to the transferred portion shall carry over to the transferee.

(g) If distributions under this Agreement are insufficient to return to any Member the full amount of such Member's Capital Contributions to the Company, such Member shall have no recourse against any other Member for the return of such Capital Contributions.

(h) Upon the liquidation of the Company (within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), but not including a liquidation of the Company that is deemed to occur pursuant to Regulations Section 1.708-1(b)(1)(iv) in the event of a termination of the Company pursuant to Section 708(b)(1)(B) of the Code), or upon a contribution of more than a *de minimis* amount of money or other property to the Company by a new or existing Member, or a distribution of more than a *de minimis* amount of money or other property to a retiring or continuing Member where such contribution or distribution alters the Interest of any Member (a

"Revaluation Event"), the Company may revalue all Company property (whether tangible or intangible) for book purposes to reflect the fair market value of Company property immediately prior to such event (or, if greater, the amount of any nonrecourse indebtedness to which such property is subject within the meaning of Code Section 7701(g)). In the event that Company property is so revalued, the Capital Accounts of the Members shall be adjusted in accordance with Regulations Section 1.704-1(b)(2)(iv)(f).

(i) Upon the distribution of Company property to a Member under circumstances not constituting a Revaluation Event, the property to be distributed shall be revalued for book purposes to reflect the fair market value of such property immediately prior to such distribution (or, if greater, the amount of any nonrecourse indebtedness to which such property is subject within the meaning of Code Section 7701(g)), and the Capital Accounts of all Members shall be adjusted in accordance with Regulations Section 1.704-1(b)(2)(iv)(e).

Section 4.3 Return of Capital and Waiver of Partition. Except as provided herein, no Member has the right to demand or receive from the Company any return of Capital Contributions made pursuant to this Agreement, except with respect to distributions during the term of this Agreement or upon dissolution of the Company except that Raymond Bourque, a Member hereof shall be entitled to receive his initial capital contribution as set forth on Schedule B attached hereto prior to any distribution of net profits.

Section 4.4 Third Party Loans. The Company may borrow from third party lenders such amounts as the Manager determines to be necessary, either for working capital or capital expenditures, on such terms and conditions as the Manager considers reasonable. The Manager may grant mortgages, security interests, or such other collateral as may be required by such third party lenders to secure any such borrowing.

Section 4.5 Member Loans. The Company may borrow from Members or their Affiliates such amounts as the Manager determines to be necessary, either for working capital or capital expenditures, on such terms and conditions as the Members considers reasonable. Upon approval by the Members, the Company may grant mortgages, security interests, or such other collateral as may be required by a Member or Affiliate of a Member to secure any such borrowing. No Member shall be required to make any such loan.

## ARTICLE V
## DISTRIBUTIONS AND ALLOCATIONS

Section 5.1 Allocation of Net Profits and Net Losses.

(a) Net Profits and Net Losses shall be allocated to the Members in proportion to their respective Interests, except, that Raymond Bourque shall be reimbursed his full initial capital contribution as set forth on Schedule B attached hereto prior to any distribution of profits.

(b) Provided, however, that upon the occurrence of an Event of Forfeiture with respect to any Member, the Net Profits or Net Losses that would

otherwise be allocable to the forfeiting Member's forfeited Interest shall be allocated to the non-forfeiting Members in proportion to their respective Interests.

Regulatory Allocations.

In the event that any Member unexpectedly receives any adjustment, allocation, or distribution described in Regulations § 1.704-1(b)(2)(ii)(d)(4)-(6) ("Reduction Items") that, after taking into account all other allocations and adjustments under this Agreement, results in a deficit balance in such Member's Capital Account as of the end of the taxable year in excess of that amount, if any, that such Member is treated as obligated to restore to the Company pursuant to Regulations § 1.704-1(b)(2)(ii)(c) or (h), 1.704-2(g)(1), or 1.704-2(i)(5) (an "Excess Deficit Balance"), then items of book income and gain for such year (and, if necessary, subsequent years) will be reallocated to each such Member in the amount and in the proportions needed to eliminate such Excess Deficit Balance as quickly as possible. Solely for purposes of computing such Excess Deficit Balance, the Member's Capital Account shall be reduced by the amount of any Reduction Items that are reasonably expected as of the end of such taxable year.

Nonrecourse deductions (within the meaning of Regulations § 1.704-2(b)(1) and (c)) shall be allocated among the Members in the same manner as deductions that are not nonrecourse deductions. If there is a net decrease in partnership minimum gain (as defined in Regulation §1.704-2(d)) for any taxable year of the Company, then before any other allocations are made for such taxable year, the Members shall be allocated items of book income and gain for such year (and, if necessary, for subsequent years) to the extent required by Regulations § 1.704-2(f).

Notwithstanding any other provisions of this Agreement, all partner nonrecourse deductions (within the meaning of Regulations § 1.704-2(i)(1) and (2)) for each taxable year of the Company shall be allocated to the Members who bear the economic risk of loss with respect to the debt giving rise to such deductions, in accordance with Regulation §1.704-2(i). If there is a net decrease in partner nonrecourse debt minimum gain (within the meaning of Regulation §1.704-2(i)(3)) for any taxable year of the Company, then after taking into account allocations pursuant to the second sentence of Section 5.2(b) but before any other allocations are made for such taxable year, the Members shall be allocated items of income and gain for such year (and, if necessary, for subsequent years) to the extent required by Regulation §1.704-2(i)(4).

Notwithstanding any other provisions of the Agreement, no book loss or deduction shall be allocated to any Member to the extent such allocation would cause or increase an Excess Deficit Balance in the Capital Account of such Member. Any such loss or deduction shall be reallocated away from such Member and to the other Members in accordance with this Agreement, but only to the extent that such reallocation would not cause or increase Excess Deficit Balances in the Capital Accounts of such other Members.

If, at the end of any taxable year, the Capital Accounts of

any Members have Excess Deficit Balances after taking into account all other allocations and adjustments under this Agreement, then items of book income and gain for such year shall be reallocated to such Members in the amount and in the proportions necessary to eliminate such Excess Deficit Balances as quickly as possible.

The allocations set forth in Sections 5.2(a) through (e) ("Regulatory Allocations") are intended to comply with certain requirements of Regulations Section 1.704-1(b). Notwithstanding any other provision of this Article V (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating other book items of income, gain, loss, and deduction among the Members so that, to the extent possible, the net amount of such allocations of other book items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Regulatory Allocations had not occurred. Notwithstanding the preceding sentence, Regulatory Allocations relating to (a) nonrecourse deductions shall not be taken into account except to the extent there has been a reduction in partnership minimum gain, and (b) partner nonrecourse deductions shall not be taken into account except to the extent there would have been a reduction in partnership minimum gain if the loan to which such deductions are attributable were not made or guaranteed by a Member.

Tax Allocations.

Items of taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the Company's adjusted basis in such property and its initial Carrying Value (computed in accordance with Section 1.1.7(a) hereof) in accordance with the principles of Section 704(c) of the Code and Regulations § 1.704-1(b)(4)(i). The Company may select any reasonable method or methods for making such allocations including, without limitation, any method described in Regulations § 1.704-3(b), (c), or (d). In the event the Carrying Value of any Company property is adjusted pursuant to Section 4.2(h), subsequent allocations of income, gain, loss, and deduction with respect to such property shall take account of any variation between such property's adjusted basis for federal income tax purposes and such Carrying Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

Tax credits shall be allocated among the Members in accordance with Regulations § 1.704-1(b)(4)(ii).

Section 5.2 Distributions. The Company may from time to time, at the direction of the Members, distribute the Distributable Cash Flow to the Members in proportion to their respective Interests provided, however, that Raymond Bourque, a Member hereof is fully reimbursed for his initial capital contribution as set forth on Schedule B attached hereto prior to any other Member obtaining a Cash Distribution or any other kind of Distribution. The term "Distributable Cash Flow" as used herein shall mean all cash revenues of the Company generated by its operations, less current charges (including the reimbursement of the Members for reasonable out of pocket and direct expenses personally incurred on behalf of the Company

and authorized in advance by the Members), principal and interest payments on any indebtedness of the Company and such amounts as the Manager, in its sole and absolute discretion, deems necessary to reserve for present and future working capital needs and contingencies. Distributable Cash Flow shall not include the proceeds of a sale of substantially all the assets of the Company.

Section 5.3 Distributions Upon Liquidation. All liquidating distributions shall be made in accordance with the provisions of Article XIV.

Section 5.4 Restrictions Against Distributions.

(a) No distribution shall be made to any Member to the extent that such distribution would cause or increase an Excess Deficit Balance in such Member's Capital Account as of the end of the taxable year of such distribution except that Raymond Bourque, a Member hereof is fully reimbursed for his capital contribution as set forth on Schedule B attached hereto prior to any other Member obtaining a cash Distribution or any other kind of Distribution.

(b) For purposes of Section 5.6(a) above, in determining the extent to which a distribution to a Member would cause or increase an Excess Deficit Balance in such Member's Capital Account, the Company's taxable year shall be deemed to close as of the end of the day of such distribution, and such Member's Excess Deficit Balance, if any, as of the end of such taxable year shall be determined after taking into account any allocations or other adjustments to such Capital Account for such deemed taxable year.

(c) Any amount that would otherwise be distributable to a Member but that is not distributed because of the limitation as set forth in Section 5.6(a) above shall be retained by the Company as a Company asset, and shall be distributed to such Member at such time as such distribution would not contravene such limitation.

## ARTICLE VI
## MANAGEMENT

Management Generally.

(a) The business of the Company shall be managed under the direction of the Manager. The Manager is hereby designated by the Members to be Vincent Mesolella (the "Manager") who shall have and may exercise all powers necessary to effectuate the purposes of the Company pursuant to the Act, except as expressly limited herein.

Section 6.1 Specific Powers. Without in any way limiting the powers of the Company in furtherance of its business purpose as set forth in Section 2.4 hereof, and subject only to the specific provisions of this Agreement concerning the rights of Members to approve certain acts, the Company shall be authorized to do the following, and the Manager shall have full power and authority, to take all actions, including the execution and delivery of documents, as the Manager shall, in the Manager's discretion, deem necessary, appropriate, convenient or desirable to

initiate, implement and consummate any or all of the following or otherwise to be in the best interest of the Company in furtherance of its purposes:

(a) to borrow money, issue evidences of indebtedness and, as security therefor, to mortgage, pledge or otherwise encumber the assets of the Company;

(b) to cause to be paid on or before the due date thereof all amounts due and payable by the Company to any Person;

(c) to employ such agents, employees, managers, accountants, attorneys. consultants and other persons necessary or appropriate to carry out the business and affairs of the Company, and to pay fees, expenses, salaries, wages and other compensation to such Persons;

(d) to pay, extend, renew, modify, adjust, submit to arbitration, prosecute, defend or compromise, any obligation, suit, liability, cause of action or claim, including taxes, either in favor of or against the Company;

(e) to pay any and all fees and to make any and all expenditures necessary or appropriate in connection with the organization of the Company, and the carrying out of its obligations and responsibilities under this or any other Agreement;

(f) to cause the Company's property to be maintained and operated in a manner that satisfies in all respects the obligations imposed with respect to such maintenance and operation by law, by any mortgages encumbering such property from time to time, and by any lease, agreement or rental arrangement pertaining to such property;

(g) to cause necessary and proper repairs to be made, and supplies necessary for the proper operation, maintenance and repair of the Company's property to be obtained; and

(h) to lease, sell, finance or refinance all or any portion of the Company's property.

Section 6.2 Restrictions on Authority of the Manager.

(a) Notwithstanding any other provision of this Agreement, the Manager shall not have authority to take any of the actions specified in paragraph (b) and (c) below unless the Manager has received the approval specified in each paragraph:

(b) The following actions shall require the consent of Members acting by majority vote:

(i) waiving full compliance with any provision of this Agreement, including, by way of example, and without limitation, use or distribution of Company properties or revenues other than as specifically provided in this Agreement (or any other agreement to which the Manager, the Company and each Member is a party and which specifically references this provision);

(ii) expending, or agreeing to expend, funds for, or accruing or incurring any liability or obligation for, any item or purpose or in respect of a capitalized lease for a dollar amount in excess of $100,000 or the mortgage, pledge or assignment of, granting of a security interest in, or placing of a lien on, more than 20% in fair market value of Company properties not either expressly permitted by this Agreement, or incorporated into an annual budget for the period in question previously approved by the Members;

(iii) making any tax election without providing each Member at least fifteen (15) days notice with all relevant details (including the pro forma effect of such election on each Member), with the right to comment and provide input on such election, before making any filing with the applicable taxing jurisdiction (with the Manager being hereby authorized to extend any applicable tax filing deadline which occurs during such 45 day period if a Member has not yet provided such Member's input or waived the right to do so);

(iv) engaging any Member or any Affiliate of any Member to provide goods or services to the Company consistent with Section 6.10 provided, that the Members shall not unreasonably withhold their consent to any such proposed engagement;

(v) approving the Company's annual budget;

(vi) drawing any check in excess of $25,000;

(vii) approving distributions to the Members; or

(viii) entering into any employment agreement with a Manager.

(c) In addition to the items in paragraph (b) above, the following actions shall require the unanimous consent of the Members:

(i) the sale or leasing of all or substantially all of the Company properties in a single transaction;

(ii) the dissolution or liquidation of the Company, or consolidation or merger of the Company with any Person;

(iii) except as otherwise explicitly provided in this Agreement, amending this Agreement or the Articles of Organization;

(iv) admitting additional Members;

(v) guarantying or otherwise becoming liable for, contingently or otherwise, the obligations of any Person (other than the Company) to any other Person;

(vi) doing any act in contravention of this Agreement or the Act;

(vii) doing any act or permitting any act which the Manager has the authority to prevent which would cause the Company to be taxed for Federal income tax purposes as an association taxable as a corporation;

(viii) responding to any tax audit without permitting each Member the opportunity to participate in all phases thereof, or settling any tax audit without the consent of any Member, if that Member would incur liability for taxes, interest and/or penalties in excess of $10,000 as a result of such settlement;

(ix) creating any new class of Membership Units or other equity-like interest in the Company;

(x) doing any act which constitutes a Change of Control; or

(xi) changing the number of Managers.

(d) Upon the receipt of any written consent or approval of the Members required under this Agreement as to any particular matter, the Manager shall have full power and authority, without any further consent or approval of the Members, to take all actions, including the execution and delivery of documents, as the Manager shall, in the Manager's discretion, deem necessary, appropriate, convenient or desirable to implement and consummate the approved matter.

Section 6.3 (Intentionally omitted)

Section 6.4 Activities of the Manager.

(a) The Manager shall devote so much of his or her time to the affairs of the Company as in his or her judgment the conduct of the Company business shall reasonably require and the Manager shall not be obligated to do or perform any act or thing in connection with the business of the Company not expressly set forth herein.

(b) No Manager shall be precluded from engaging directly or indirectly in any other business for his, her or its own account or for the account of any other Person, provided, however, that no Manager may engage directly or indirectly in any other business whose activities or products include buying, selling, leasing and licensing of construction machinery and equipment. No Manager shall, by reason of being a Manager in the Company, have any right to participate in any manner in any profits or income earned or derived by or accruing to the Members or the Manager (or the partners, Members, managers, officers, directors, employees or other agents of any such Person) from the conduct of any business other than the business of the Company or from the conduct of any activities for any account other than that of the Company.

Section 6.5 Organizational and Other Expenses. The Manager is authorized to pay the expenses incurred by the Company in the organization of the Company, including, without limitation, legal, accounting, financial consulting and other fees and reimbursements of expenses incurred by Affiliates and agents of Members or Manager. The Manager and the Members hereby agree and acknowledge that the Company shall be responsible for and pay the legal fees

of Michael A. Kelly, incurred on behalf of the Company, in the form of one buildable lot located in the subdivision situated in the Town of Cumberland and known as the Greatwoods Development.

(a) The Members hereof agree and acknowledge that commencing on the date hereof and apart from any expenses and fees already incurred by Raymond Bourque as set forth on Schedule B attached thereto any and all organizational, legal, engineering, construction and architectural fees and expenses as incurred by the Company in furtherance of its primary goal should be charged to each Member in accordance with their ownership interest as set forth in Schedule A attached hereto. The Members of the Company and their interest in the profits, losses and distributions from the Company are set forth in Schedule A attached hereto.

## ARTICLE VII
## OFFICERS

[INTENTIONALLY OMITTED]

## ARTICLE VIII
## POWERS OF MEMBERS AND MANAGER TO CONTRACT WITH THE COMPANY

Any Member or Manager of the Company may enter into and perform any contract or agreement of any nature between the Company and such Member or Manager, or any firm, corporation or other entity in which any such Member or Manager may be interested, directly or indirectly, whether such individual, firm, corporation or other entity thus contracting with the Company shall thereby derive profits or benefits; provided that (i) the actual facts of such interest are disclosed or are known to the Manager which authorizes such contract or agreement; and (ii) the contract or agreement is fair as to the Company as of the time it is authorized, approved or certified by the Members. This Article IX shall not be construed to invalidate any contract or other transaction that would otherwise be valid under the common or statutory law applicable thereto.

## ARTICLE IX
## LIMITATION ON LIABILITY

No current or former Manager or officer of the Company shall be personally liable to the Company or its Members for monetary damages for breach of fiduciary duty as a Manager or officer of the Company notwithstanding any provision of law imposing such liability; provided, however, that this provision shall not eliminate liability of a Manager or officer (i) for any breach of the Manager's or officer's duty of loyalty to the Company and its Members, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, or (iii) for any transaction from which the Manager or officer derived an improper personal benefit. No amendment or repeal of this paragraph shall adversely affect any of the rights or protection afforded to a Manager or officer of the Company for or with respect to any acts or omissions of such Manager or officer occurring prior to such amendment or repeal.

ARTICLE X
ADMINISTRATIVE MATTERS

Section 10.1 Books of Account. At all times the Company shall maintain or cause to be maintained true and proper books, records, reports and accounts in accordance with generally accepted accounting principles, consistently applied, in which shall be entered fully and accurately all transactions of the Company. The Company shall keep vouchers, statements, receipted bills and invoices and all other records in connection with the Company's business.

Section 10.2 Reports. The officers of the Company shall provide the Company's Manager and Members with such reports as may be reasonably requested and required to keep them advised of the Company's current and projected operations and financial condition.

Section 10.3 Tax Matters Partner. The Tax Matters Partner of the Company shall be the Company's Treasurer; provided, however, that if such person would not be treated as a party to the proceeding within the meaning of Code Section 6226(c) and (d) for any taxable year involved in a partnership proceeding, then the Tax Matters Partner for such year shall be a Member who is designated by the Manager at the time the Notice of Final Partnership Administrative Adjustment is received and who would be treated as a party to the proceeding within the meaning of Code Section 6226(c) and (d) for such year.

Section 10.4 Tax Matters Handled by the Company. The Manager, on behalf of the Company and with the consent of the Members, shall have full authority to negotiate with, to conclude agreements with or to refuse to agree with Federal, state, local and foreign taxing authorities as to the taxable income of the Company for any taxable period and any determination of such taxable income shall be binding upon the Members, each of whom individually shall be liable to pay any additional tax and interest and shall be entitled to receive any refund and interest resulting from such determination. The Company shall not be responsible for any loss or damage to any Member, as a result of any such determination or failure to arrive at a determination. The Company may also make such elections, including, without limitation, an election under Section 754 of the Code, as the Manager may determine.

~~Section 10.5 Fiscal Year. The fiscal year of the Company shall end on December 31.~~

ARTICLE XI
TRANSFER OF INTERESTS/NON-COMPETITION

Section 11.1 Restrictions on Transfer.

(a) Except as otherwise provided in this Agreement, no transfer, pledge, hypothecation or assignment of the Membership Units or other Interest of a Member shall be permitted, and no purported transfer shall be recognized by the Company; provided, however, that all or a portion of a holder's Membership Units may be transferred to one or more then-current other holders of Membership Units with the consent of the Members.

(b) Notwithstanding anything to the contrary contained in this Article XI, a Member may transfer its Membership Units (i) into a trust or other estate-planning vehicle, controlled by such Member or a Member of the Member's immediate family, for the benefit of the Member and/or his/her immediate family, or (ii) with the prior consent of the Manager, which will not unreasonably be withheld, if such holder has complied with Section 11.2 (each such transferee pursuant to a transfer permitted by Sections 11.1(b)(i) or 11.1(b)(ii) a "Permitted Transferee"); provided, however, that any transfer or other disposition of Membership Units by any such Permitted Transferee shall be subject to the restrictions on transfer specified in this Article XI.

(c) Notwithstanding anything to the contrary contained in this Article XI, a Member may transfer Membership Units to a third party if such transfer has first been approved by the holders of a majority of the Membership Units with voting rights at the time outstanding exclusive of the Membership Units then held by the Member seeking to make such transfer.

Section 11.2 Right of First Refusal; Co-Sale.

(a) In the event a holder of Membership Units (a "Selling Member") wishes to sell or otherwise transfer his/her Membership Units (other than a transfer pursuant to Sections 11.1(a) or 11.1(b)(i) hereof) and is in receipt of a bona fide offer (an "Offer") to purchase such Membership Units, which such Selling Member desires to accept, the Selling Member shall notify the Manager and the other Members holding Membership Units in writing of the terms of the Offer at least forty-five (45) calendar days prior to the date of the proposed sale (the "Offer Notice"). Upon receipt of the Offer Notice, each such other Member holding Interests shall have fifteen (15) days to either (i) exercise a right of first refusal to purchase some or all of the Selling Member's Membership Units covered by the Offer pursuant to Section 11.2(b) (the "Right of First Refusal"), or (ii) exercise a right to co-sell a pro rata portion of its Membership Units to the offeree set forth in the Offer Notice (the "Proposed Transferee") pursuant to Section 11.2(c) (the "Co-Sale Right"). If any Member fails to notify the Selling Member in writing within said fifteen (15) day period of its election to exercise either the Right of First Refusal or the Co-Sale Right, such Member shall be deemed to have waived all such rights. Upon the waiver of any Right of First Refusal by the Members, the Company may elect to purchase the Selling Member's interest.

~~(c)~~(b) The other Members' Right of First Refusal shall be exercised, if at all, at a price equal to the lesser of (i) the Offer price, or (ii) the Fair Market Value as to the Vested Interest and Fair Market Value as to the Interest other than the Vested Interest. Any other Member shall have the right to purchase the proportion of the Membership Units covered by the Offer Notice that is equal to the ratio the amount of such Member's Membership Units bears to the total number of Membership Units held by Members electing to participate in the Right of First Refusal.

(c) A Member that elects to exercise its Co-Sale Right (a "Co-Selling Member") shall have the right to include in the sale covered by the Offer Notice up to the proportion of the Membership Units covered by the Offer Notice that is equal to the ratio the amount of such Co-Selling Member's Membership Units bears to the sum of (i) the aggregate number of Membership Units held by Members electing to exercise the Co-Sale Right and (ii) the Selling

Member's Membership Units (the "Co-Sale Units"). The Selling Member will cause the Proposed Transferee (or, as applicable, the other Members exercising the Right of First Refusal) to offer to purchase each Co-Selling Member's Co-Sale Units upon the same terms and conditions as are set forth in the Offer Notice. In the event that the Proposed Transferee (or, as applicable, the other Members exercising the Right of First Refusal) refuses to purchase each Co-Selling Member's~~Co-~~ Co-Sale Units in addition to the Membership Units covered in the Offer Notice, the Selling Member will reduce the number of its Membership Units to be sold to the Proposed Transferee (or, as applicable, to the other Members exercising their Right of First Refusal) so that the aggregate number of Co-Sale Units, together with the Membership Units to be sold by the Selling Member shall equal the number of Membership Units that were the subject of the Offer Notice.

(d) If the Members other than the Selling Member or the Company do not exercise the Right of First Refusal or the Co-Sale Right, the Selling Member may sell the Membership Units covered by the Offer Notice only on the terms (including the date) of the Offer, and only to the Proposed Transferee. If the Selling Member has not sold, transferred or assigned the Membership Units to the Proposed Transferee pursuant to the Offer Notice within one hundred and eighty (180) days after the Offer Notice, then the restrictions provided by this Section shall again become effective with respect to the Selling Member's Membership Units.

Section 11.3 Required Sale of Membership Units.

(a) In the event of the resignation as a Member, Involuntary Transfer (as defined below), dissolution, liquidation, divorce or death (each a "Liquidating Event") of any holder of Membership Units (the "Liquidating Member"), then the Liquidating Member (or its executor, administrator, trustee or representative, as applicable) shall immediately deliver written notice thereof to the Company. Upon the earlier to occur of (a) receipt of such notice or (b) actual knowledge of a Liquidating Event (the "Liquidating Notice Date"), the Company shall in turn promptly give notice thereof to the other Members. During the period ending thirty (30) days after the Liquidating Notice Date, the Company and any of the other Members, in accordance with the immediately following sentence, may require the Liquidating Member to sell its Membership Units for the Fair Market Value thereof by delivering written notice to the Liquidating Member (or to its executor, administrator, trustee or representative, as applicable) to ~~the Company and to each of the other Members at least forty five (45) days prior to the date of~~ the proposed purchase. The Company shall first have ten (10) days from the Liquidating Notice Date to elect to purchase some or all of the Membership Units owned by the Liquidating Member by delivering written notice thereof (the "Company Notice") to the Liquidating Member (or to its executor, administrator, trustee or representative, as applicable) and the other Members, specifying how many of such Membership Units it wishes to purchase. The other Members shall have fifteen (15) days from the date of the Company Notice to exercise their right to purchase such of the Liquidating Member's Membership Units, if any, as the Company has not elected to purchase by delivering written notice thereof to the Liquidating Member (or to its executor, administrator, trustee or representative, as applicable). All Members electing to purchase the Membership Units of a Liquidating Member shall acquire such Membership Units on a pro rata basis in proportion to the aggregate amount of Membership Units held by all Members electing to purchase hereunder. For purposes of this Section, an "Involuntary Transfer" shall mean any transfer, proceeding or action by or in which the Liquidating Member shall be involuntarily

deprived or divested of any right, title or interest in or to any of the Membership Units, including, without limitation, any seizure under levy of attachment or execution, any transfer in connection with bankruptcy (whether pursuant to the filing of a voluntary or an involuntary petition under the United States Bankruptcy Code or any modifications or revisions thereto) or other court proceeding to a debtor in possession, trustee in bankruptcy or receiver or other officer or agency, any transfer to a state or to a public officer or agency pursuant to any statute pertaining to escheat or abandoned property, or any transfer pursuant to a divorce or separation agreement or a final decree of a court in a divorce action.

(b) In the case of any payment required under Section 11.3(a), the Company may issue a promissory note in the aggregate principal amount of such payment bearing interest at the Prime Rate. In the case of a cash payment in respect of such promissory note, notwithstanding any of the provisions of such note, including without limitation, the stated maturity of such note and the stated date on which interest payments are due, such payment will not become due and payable until such time as such payment can be made without violating any loan documents to which the Company, from time to time, is a party, and not resulting in the Company having less cash than the Manager determines in good faith is prudent to operate the business of the Company in the ordinary course of business. The Company may elect to purchase insurance to pay the Fair Market Value of Membership Units held by a Manager or officer (or its executor, administrator, trustee or representative, as applicable) subject to a Liquidating Event in one payment rather than issue a promissory note.

(c) Notwithstanding anything in this Section 11.3 to the contrary, Members holding only Membership Units without voting rights shall not have any right to purchase Membership Units with voting rights pursuant to this Section 11.3 without the consent of the Manager.

Section 11.4 (Intentionally Omitted.)

Section 11.5 Admission of New Members. No new Member shall be admitted to the Company, and the Company shall not recognize on its books any new Member, unless the Manager and majority of the holders of all of the Membership Units at the time outstanding shall, in their sole discretion, agree to the admission of such new Member and such proposed new Member shall have executed a counterpart signature page to this Agreement. Any purported admission of a new Member in violation of this Agreement shall not be recognized or in any manner given effect, and such person shall not be entitled to any rights or powers accorded to a Member under law or this Agreement.

Section 11.6 Improper Transfers. The Company shall not recognize on its books any voluntary or Involuntary Transfer in violation of this Agreement, and any such purported Transferee shall not be recognized as a Member and shall not be entitled to any rights or powers accorded to a Member under law or this Agreement.

## ARTICLE XII
## INDEMNIFICATION

Section 12.1 Indemnification By Members. Each of the Members agrees to indemnify, defend and hold harmless each other, the Manager and the Company from and against all loss, damage (including incidental and consequential damages), expense (including court costs, reasonable attorneys' fees, interest expenses and amounts paid in compromise or settlement), suits, actions, claims, penalties, liabilities or obligations related to, caused by or arising from or on account of:

(a) any breach of any representation or warranty made by it herein;

(b) any failure by it to fulfill any agreement or covenant made pursuant to this Agreement; or

(c) any act which constitutes fraud, misconduct or gross negligence and which is injurious to the Company.

Each Member's indemnification obligations under this Article XIII shall survive the termination of this Agreement.

Section 12.2 Indemnification By Company. The Company shall indemnify, defend and hold harmless the Manager and its officers, and may, in the discretion of the Manager, indemnify, defend and hold harmless employees and agents of the Company, to the fullest extent permissible under Rhode Island law other than for gross negligence or willful misconduct; provided however, that any such indemnity shall be provided out of and to the extent of the Company assets only, and no Member shall have personal liability on account thereof.

Section 12.3 Right Not Exclusive. The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Article XIII shall not be exclusive of any other right which any Person may have or hereafter acquire under any statute, provision of this Agreement, vote of Members or otherwise.

Section 12.4 Insurance. The Company may maintain insurance, at its expense, to protect itself and any Member, the Manager, officer, employee or agent of the Company against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under Rhode Island law.

Section 12.5 Amendment. Any amendment, repeal or modification of any provision of this Article XIII shall not adversely affect any right or protection of a Member, the Manager, or any officer, employee or agent of the Company existing at the time of such amendment, repeal or modification.

## ARTICLE XIII
## DISSOLUTION

Section 13.1 Events of Dissolution. The Company shall be dissolved within sixty (60) days after the occurrence of any of the following events (a "Dissolution Event"), unless within

said sixty (60) day period the holders of a majority of the issued and outstanding Membership Units agree in writing to continue the Company:

(a) the unanimous written agreement of the holders of all of the Membership Units;

(b) pursuant to a voluntary or involuntary bankruptcy petition;

(c) the sale or other disposition of all or substantially all of the assets of the Company; or

(d) the entry of a court decree of judicial dissolution of the Company pursuant to R.I. Gen. Laws §7-12-43.

Section 13.2 Liquidation. Upon the occurrence of a Dissolution Event, the Manager shall carry out the winding up of the Company and shall immediately commence to wind up the Company's affairs; provided, however, that a reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the satisfaction of liabilities to creditors so as to enable the Members to maximize the value of the net assets or to minimize the normal losses of the Company, as the case may be, attendant to the liquidation. Upon the occurrence of a Dissolution Event, the Company shall make no distributions in respect to the issued and outstanding Membership Units except for a Distribution to Raymond Bourque, as a Member hereof, for reimbursement of his full initial capital contribution as set forth on Schedule B attached hereto. The proceeds of liquidation (the "Liquidating Distribution") shall be distributed in the following order and priority:

(a) to creditors of the Company, including to Members in their capacities as creditors and specifically Raymond Bourque for his capital initial contribution as set forth on Schedule B attached hereto, to the extent otherwise permitted by law, in satisfaction of the liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof); and next

(b) to the holders of Capital Interests in proportion to their respective Capital Contributions until the aggregate distributions received by each such holder under Section 5.1 and this Section 14.2 are equal to their respective Capital Contributions; and next

(c) to the holders of the issued and outstanding Capital Interests and Profits Interests in proportion to their respective positive Capital Account balances.

## ARTICLE XIV
## MISCELLANEOUS

Section 14.1 Amendment. This Agreement may be amended by the Members holding two-thirds of the issued and outstanding Membership Units; provided, however, that no amendment to this Agreement may: (1) modify the limited liability of a Member or increase the liabilities or responsibilities of, or (except for dilution resulting from the admission of additional Members as otherwise permitted under this Agreement) diminish the rights or protections of, any Member under this Agreement; in each case, without the consent of each such affected Member;

(2) alter the interest of any Member in income, gains and losses or amend or modify any portion of Article IV without the consent of each Member adversely affected by such amendment or modification (except in connection with the admission of additional Members as otherwise permitted under this Agreement); (3) amend this Section 15.1 without the consent of all of the Members; or (4) amend any provision of this Agreement which establishes the consent or approval of a percentage of the issued and outstanding Membership Units greater than a simple majority as a condition or prerequisite to any action of the Manager or the Company without the consent of such applicable percentage.

Section 14.2 Waiver. Any waiver of any of the terms hereof shall be effective only for the instance for which it is given and shall not constitute a waiver of a subsequent occurrence or of any other provision hereof.

Section 14.3 Notices. All notices, requests, demands and other communications made with respect to this Agreement or any other agreements executed in connection herewith shall be in writing, and personally delivered, sent by registered or certified mail (postage prepaid), by telecopier or by prepaid carrier service, in accordance with the terms of Section 6.6, mutatis mutandis. All such notices shall be addressed as follows:

(i) if to the Company:

235 Promenade Street, Suite 140
Providence, Rhode Island 02908

With a copy to:

Michael A. Kelly, Esq.
55 Pine Street, 5th Floor
Providence, RI 02903

(ii) if to any Member, at the address of such Member set forth in Schedule A hereto;

or to such other address as may be specified in a notice given to the other party in accordance with this Section 14.3.

Section 14.4 Binding Agreement. This Agreement shall be binding upon the assigns, executors, administrators, estates, heirs and legal successors of the parties hereto.

Section 14.5 Governing Law. This Agreement and all questions arising hereunder shall be determined in accordance with the internal law of the State of Rhode Island, without regard to the choice of law provisions thereof.

Section 14.6 Severability. If one or more provisions in this Agreement is held or found to be invalid, illegal or unenforceable in any respect, such provision(s) shall be given effect to the maximum extent permitted by law and the invalidity, illegality or unenforceability of such provision(s) shall not affect the validity of the remaining provisions of this Agreement.

Section 14.7 Counterparts. This Agreement may be executed in two or more counterparts, each of which shall constitute an original and all of which shall be deemed one and the same agreement, binding on all of the parties hereto, notwithstanding that all of the parties are not signatory to the original or the same counterpart.

Section 14.8 Entire Agreement. This Agreement is intended by the Members to constitute the "operating agreement" of the Company within the meaning of Section 34-101(14) of the Act. This Agreement contains the entire understanding among the Members. This Agreement supersedes any prior written or oral agreement between the Members with respect to the subject matter hereof. This Agreement shall be considered as drafted equally by the Members and any ambiguity shall not be construed in favor of or against any Member.

Section 14.9 Headings. The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning thereof.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

SIGNATURE PAGE OF OPERATING AGREEMENT

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

| | |
|---|---|
| Witness | Raymond Bourque, Member |
| Donna Gauthier<br>Witness | Eric S. Ahlborg, Member |
| Donna Gauthier<br>Witness | Vincent Mesolella, Member |

**SCHEDULE A**

OPERATING AGREEMENT OF GREATWOODS DEVELOPMENT, LLC

| Member | Address | Capital Contribution | Membership Units | Total Membership Interests | Vested Interest as of the date of Agreement | Increase in Vested Interest per 12-month period |
|---|---|---|---|---|---|---|
| Raymond Bourque | [---] | See Schedule B | 500 | 50% | 50% | 0 |
| Vincent Mesolella | | [---] | 250 | 25% | 25% | 0 |
| Eric S. Ahlborg | | [---] | 250 | 25% | 25% | 0 |
| | | | | | | |
| | | | | | | |
| ______________ | | | | | | |
| **TOTAL** | | [---] | 1,000 | 100% | | |

# SCHEDULE B

OPERATING AGREEMENT OF GREATWOODS DEVELOPMENT, LLC
RAYMOND BOURQUE INITIAL CAPITAL CONTRIBUTION

I. RAYMOND BOURQUE

| EXPENSES/FEE | COST |
|---|---|
| Land Acquisition | $ |
| Engineering Fees | $ |
| Land Acquisition Deposits | $ |
| Legal Fees | $ |
| Other | $ |